ESTATE OF MARY B. CONNELLY, Deceased, WILBUR THOMAS CONNELLY, Administrator, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Connelly v. Commissioner
Docket No. 7780-72.
United States Tax Court
T.C. Memo 1975-328; 1975 Tax Ct. Memo LEXIS 42; 34 T.C.M. (CCH) 1429; T.C.M. (RIA) 750328; 53 Oil & Gas Rep. 599; November 6, 1975, Filed Wilbur Thomas Connelly, pro se. Johnny B. Mostiler and Daniel A. Taylor, Jr., for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined the following deficiencies in the petitioner's Federal income taxes: Addition to tax
Sec. 6651(a), Year
Deficiency
I.R.C. 1954
1969
$1,683.00
1970
32.00
$8.00 We must decide whether, when Mrs. Connelly apparently acquired and disposed of certain oil and gas lease applications, she was the real owner of such applications or was acting as a nominee. We must also decide whether there was reasonable cause for the failure to file a signed 1970 Federal income tax return on behalf of Mrs. Connelly. FINDINGS OF FACT Some of the facts have been stipulated, and those facts *43 are so found. The petitioner is the Estate of Mary B. Connelly, deceased, who died on March 10, 1971. Wilbur Thomas Connelly, her son, was appointed administrator of her estate on May 17, 1971. He resided in Houston, Tex., at the time of filing the petition herein. During the years 1968 through 1970, Mrs. Connelly resided in Houston, Tex. Her 1969 Federal income tax return was filed with the District Director of Internal Revenue, Austin, Tex. Her 1970 return was prepared and signed by her accountant as its preparer, but was not signed by her, nor by anyone authorized to sign for her. The return was mailed to the District Director of Internal Revenue, Austin, Tex., on or after April 14, 1971, by her son-in-law, Gene Van Dyke, who was named in Mrs. Connelly's will as her executor. Mr. Van Dyke operated an oil and gas exploration and development business. In 1968, large oil and gas reserves were discovered in Alaska, and Mr. Van Dyke sought to lease land that had such reserves. He located approximately 800,000 acres of such land (the Van Dyke block) which he believed were likely to be productive. However, in August 1968, he applied for leases in his own name on tracts totaling only *44 298,000 acres because he understood that Federal regulations prevented him from applying for leases on tracts totaling in excess of 300,000 acres. Applications on the remaining acreage in the Van Dyke block were made by Don Simasko, a land broker in Alaska, and his wife, Lillian. As a land broker, Mr. Simasko customarily took title to interests in land purchased for his clients until a transfer was made to such clients. Yet, Mr. Simasko was anxious to transfer title to the acres he held in the Van Dyke block because he understood Federal regulations would prevent him from acquiring title to any more land in that leasing district so long as he held such acreage. It was decided that Mr. Simasko would transfer his interest in the Van Dyke block to Mr. Plumb, an employee of Mr. Van Dyke, who would hold the land as Mr. Van Dyke's nominee. Thereafter, at Mr. Van Dyke's direction, Mr. Plumb assigned the lease applications to Mrs. Connelly, and Lillian Simasko assigned her interest in the lease applications to Mrs. Van Dyke. The terms of the assignments had been completely negotiated by Mr. Van Dyke: It was provided that Mr. Simasko was to receive a 1-percent overriding royalty on the acreage *45 assigned in the event oil was discovered, and that Mr. Van Dyke was to reimburse Mr. Simasko for all of his expenses connected with his initial filing of the lease applications. The transfer to Mrs. Connelly was effected by her filing applications for leases and by Mr. Simasko then withdrawing his applications. All arrangements for the transfer were made by Mr. Van Dyke, and on August 28, 1968, Mrs. Connelly signed 80 lease applications in Mr. Van Dyke's home. Mr. and Mrs. Van Dyke borrowed funds needed to pay the filing fees and advanced rental payments with respect to the lease applications. The loan was guaranteed by certain unrelated individuals, who were to receive for such guarantee an overriding royalty of one-half of one percent. Although Mrs. Connelly was not a party to the loan by the bank or to the guarantee, she, in accordance with the arrangements made by Mr. Van Dyke, assigned to one of the guarantors the same income interest as Mr. and Mrs. Van Dyke assigned with respect to their lease applications. Mrs. Connelly also assigned to one of the guarantors the right to receive any amounts refunded in the event her applications were withdrawn or rejected, even though *46 she was not a party to the guarantee. Such right was transferred to the guarantors to assure them that the loan would be repaid in any event. Mrs. Connelly was a retired school nurse and had only enough income for her support. Mr. Van Dyke loaned Mrs. Connelly $95,383 for the filing fees for her applications, and she paid such fees on September 3, 1968. On the following day, she executed a promissory note to Mr. and Mrs. Van Dyke for such amount; the note was due in 120 days and bore 7-1/2 percent interest. Principal and interest payments past due bore interest at 10 percent. On December 6, 1968, Mrs. Connelly executed a new will in order to transfer her applications to Mr. Van Dyke upon her death. Mr. Van Dyke arranged for a partnership to purchase an interest in the lease applications filed on the Van Dyke block and to make a loan with respect to such applications. On February 6, 1969, the partnership entered into identical agreements with Mr. Van Dyke, Mrs. Van Dyke, and Mrs. Connelly. The partnership loaned Mrs. Connelly $85,000, for which she executed a promissory note with a 5-year term to the partnership secured by her applications. In the loan agreement, she promised she *47 would not assign or convey her applications until the note was paid. On February 7, 1969, Mrs. Connelly deposited such proceeds in her checking account and, on the same day, drew a check for $85,000 to Mr. and Mrs. Van Dyke, on which she noted that the check was partial payment of their loan to her. Mrs. Connelly sold a 12-1/2 percent interest in her applications to the partnership for $19,000. On March 25, 1969, she deposited such proceeds in her checking account and, on the same day, drew a check for $19,000 to Mr. Van Dyke. Mr. Van Dyke applied the checks to the principal due on his and Mrs. Van Dyke's loan to Mrs. Connelly. The checks totaled more than the principal, and he used the excess to defray part of Mrs. Connelly's share of an account he had established for expenses incurred to investigate the Van Dyke block. He never computed the interest due on the loan and never applied any part of Mrs. Connelly's payments to such interest. On October 22, 1970, Mrs. Connelly transferred her applications, without consideration, to Mr. Van Dyke's oil and gas company. At the time of the trial of this case, November 14, 1974, the note from Mrs. Connelly to Mr. and Mrs. Van Dyke had *48 not been canceled, although interest was still due on it. Nor had the leases for which Mr. and Mrs. Van Dyke and Mrs. Connelly applied been granted by such time. Mrs. Connelly deducted the filing fees for her applications on her 1968 Federal income tax return, resulting in a carryover loss claimed on her 1969 return. She did not report the sale of an interest in her applications to the partnership on her 1969 return. The Commissioner determined that such fees were not deductible, that there was no carryover loss to 1969, and that, in 1969, Mrs. Connelly realized a capital gain as a result of the sale to the partnership. The Commissioner also determined a deficiency for 1970, including an addition to tax for the failure to file a proper return for such year. OPINION We must decide whether Mrs. Connelly was the real or nominal owner of the lease applications for Federal income tax purposes. This issue poses a factual question, and hence, we must examine and evaluate all the facts and circumstances surrounding Mrs. Connelly's acquisition and disposition of the lease applications. Upon an examination of the evidence in this record, we conclude that Mrs. Connelly was merely the nominal *49 owner of them. It has been observed many times that transactions between family members require careful scrutiny, since they are not always what they appear to be. , affg. a Memorandum Opinion of this Court; ; , affd. per curiam . In numerous cases, title to property was placed in the name of one family member; yet, it was found that another family member was the real owner for tax purposes. ;, affg. a Memorandum Opinion of this Court; , affd. ; , affd. , cert. denied ; In such situations, we have found certain factors are helpful in deciding the *50 factual issue of who is the owner of property for tax purposes. These factors include the intent of the parties, which party controlled and enjoyed the property, and the financial stake of the parties. ;; ; ;;; We shall examine each of these factors in turn. A review of the evidence convinces us that all the transactions in this case were planned by Mr. Van Dyke and were designed to carry out his purposes. After some investigation, he located approximately 800,000 acres that he wanted to lease in Alaska. However, he understood that Federal regulations would prohibit him from personally leasing more than 300,000 acres in such region. Consequently, Mr. Van Dyke sought to find a way in which he could lease the 800,000 acres without running afoul of what he understood to be Federal law with respect to the lease applications. To accomplish *51 this goal, Mr. Van Dyke applied for leases on tracts totaling 298,000 acres and initially had others apply for leases on the remaining acreage. In time, he arranged for some of the applications to be transferred to his wife and for the balance to be transferred to Mrs. Connelly. The evidence indicates that Mr. Van Dyke never intended Mrs. Connelly to be more than a nominal owner, and she understood this. Her only function with respect to the lease applications was to allow Mr. Van Dyke to do indirectly what he believed he could not do directly. Mrs. Connelly had no independent control over the lease applications; nor did she enjoy any of the benefits derived from them. It was Mr. Van Dyke who controlled the property, used it for his purposes, and enjoyed the benefits therefrom. Every action Mrs. Connelly took with respect to the applications was pursuant to a request from Mr. Van Dyke. Every aspect of Mrs. Connelly's involvement in the transaction was arranged, orchestrated, and implemented by Mr. Van Dyke. Mr. Van Dyke had lease applications drawn up in Mrs. Connelly's name, and at Mr. Van Dyke's request, she signed 80 lease applications, which he then had filed. Mr. Van Dyke *52 arranged to have Mrs. Connelly grant an income interest in the lease applications she held to a guarantor of the loan obtained by Mr. and Mrs. Van Dyke. Mrs. Connelly never received anything from this guarantor, yet, Mr. Van Dyke was able to gain the guarantee by use in part of the applications in her name. She also gave the same guarantor the right to receive the refunds of the filing fees, which would result if she withdrew the applications or if they were rejected. The reason the guarantor was given this right was to make sure that Mr. Van Dyke's loan was repaid. Again, these facts show that Mr. Van Dyke controlled and enjoyed the applications and demonstrate his ownership of them. Mrs. Connelly was an elderly woman with a heart condition. As of the date the applications were made in Mrs. Connelly's name, her will provided that the residue of her estate, which would have included the lease applications, would go to her son, Mr. Connelly. However, 3 months after the applications had been filed in Mrs. Connelly's name, Mr. Van Dyke's attorneys redrafted her will to provide that he would get the lease applications upon her death. This change in Mrs. Connelly's will, arranged by Mr. *53 Van Dyke, is further evidence showing his ownership of the applications. See . An examination of Mrs. Connelly's financial stake in the lease applications further shows that she had no beneficial interest in them; nor did she take any risk in connection with them. She was a retired school nurse, who had only enough income for her support. She was induced by Mr. Van Dyke to take title to the lease applications by his assurances that she would not be taking any risks; he would supply all of the necessary funds. Mr. Van Dyke purported to loan Mrs. Connelly $95,383, the cost of filing fees for the applications, and Mrs. Connelly executed a promissory note. Under this purported note, repayment was due 4 months thereafter; however, it was not paid then, and no request for repayment was made then or at any later time. Interest on the outstanding and overdue principal was never computed and was never requested. Considering all the evidence, it is clear to us that there was no genuine loan by the Van Dykes to Mrs. Connelly, made at arm's length. See ; cf. , *54 affd. per curiam ; . The note merely served to keep up the fiction that Mrs. Connelly was the real owner of the lease applications. Furthermore, Mr. Van Dyke testified that Mrs. Connelly was very cautious about money and executed the promissory note only because there was no risk in connection therewith, since she could always withdraw the applications and receive a refund of the filing fees. This refund would be sufficient to repay the loan. Yet, Mr. Van Dyke had arranged for his guarantor to have a right to receive such refunds, and therefore, Mrs. Connelly could not look to such refunds to pay off the loan. Since Mrs. Connelly had no other means to pay off the loan, we cannot believe that she considered the loan to be a real obligation or that she was acting on her own behalf when she gave away the very means by which it is claimed she intended to pay off the loan. Mr. Van Dyke arranged for a partnership to make a loan secured by all the applications for leases on the Van Dyke block, including those in the name of Mrs. Connelly, and to purchase an interest in such applications. Mrs. Connelly *55 was to receive $19,000 from the sale of the income interest and $85,000 from the loan. However, on the same day she received the checks for those amounts, she drew checks payable to Mr. Van Dyke for the same amounts. Thus, she paid $104,000 over to Mr. Van Dyke and retained none of the funds for herself. His explanation of the transaction was that he received $95,383 in repayment of the loan and that the remaining $8,617 was to be credited against his expenses in exploring the oil field. Yet, there was no indication that Mrs. Connelly had any knowledge that she was obligated to share in his expenses or that she intended for part of her payments to Mr. Van Dyke to be used for that purpose. In addition, 2 years after she executed the promissory note, Mrs. Connelly transferred the lease applications to Mr. Van Dyke's corporation for no consideration. In our opinion, her assignment of her lease applications to Mr. Van Dyke's corporation explodes any notion that Mrs. Connelly was the real owner. It simply overtaxes credulity to believe that Mrs. Connelly would have entered into the transaction with the expectation of profit, assumed large debts that she could only pay off with the lease *56 applications, and then give away such applications. The evidence overwhelmingly supports our conclusion that Mrs. Connelly was merely the nominal owner of the lease applications. The Commissioner argued that, notwithstanding any private arrangement between Mrs. Connelly and Mr. Van Dyke, Mrs. Connelly must be treated as the owner of her applications for Federal income tax purposes, since the parties have assumed that it would be illegal for Mr. Van Dyke to own them. Whether applicable Federal regulations prohibited Mr. Van Dyke from leasing more than 300,000 acres of land in the same region of Alaska is a question we need not consider. Whether Mr. Van Dyke could legally own the applications in Mrs. Connelly's name would not alter the analysis as to who was the owner for Federal income tax purposes. We have recently dealt with a similar contention in . In that case, the Commissioner argued that since the applicable State law forbade corporations from acting as insurance agents, the corporations could not be treated as having earned insurance commissions. However, we held that possible violations of State or Federal law did not compel *57 us to restructure transactions under scrutiny to comply with such law when the facts mandated otherwise. See ; . The Commissioner determined an addition to tax for the year 1970 because of the failure to file a signed statutory return for that year. On or after April 14, 1971, a return for 1970 was sent to the District Director of Internal Revenue, Austin, Tex., but it was not signed by Mrs. Connelly, nor by anyone authorized to sign for her. It appears that no signed return for 1970 was ever filed. An unsigned return does not qualify as a valid return for purposes of section 6651(a). , affd. on this issue ; . The petitioner argues that the failure to file a signed return was due to reasonable cause since it asserts that prior to the due date of the return, Mrs. Connelly died, and that on the due date of the return, no fiduciary, who could have signed the return, had either qualified or been appointed for her estate. The petitioner *58 has offered no evidence to prove that Mr. Van Dyke, who was named executor in the will of Mrs. Connelly, was without authority to act for the estate when he mailed in the unsigned return of Mrs. Connelly. Moreover, if Mr. Van Dyke lacked such authority, it was Mr. Connelly's responsibility, upon his appointment as administrator in May 1971, to make sure that proper income tax returns were filed. No evidence was offered to explain why Mr. Connelly never filed a signed Federal income tax return. He claims that he was unable to secure necessary documentation from the accountant who prepared the return. Yet, the estate never offered any evidence to prove that Mr. Connelly made a timely request of the accountant to turn over the necessary records or that such a request was refused. On this record, we must sustain the Commissioner's determination of an addition to tax. . Since we have concluded that Mrs. Connelly did not, for Federal income tax purposes, own the lease applications, it follows that she is neither taxable on any gain realized by the sale of such applications, nor is she entitled to any losses claimed to have been *59 sustained in respect of them. The petitioner concedes that it is liable for the deficiency for 1970. Decision will be entered under Rule 155.